**UNITED STATES of America**

v.

**Leonard R. MONTENIERI.**

**Crim. No. 86–35–01.**

United States District Court, D. Vermont.

Dec. 18, 1986.

Christopher Baril, Asst. U.S. Atty., Rutland, Vt., for plaintiff.

William Sessions, Sessions, Keiner & Dumont, Middlebury, Vt., for defendant.

## FINDINGS OF FACT AND JUDGMENT

BILLINGS, District Judge.

On November 20, 1986, this matter came before the Court for trial, defendant having specifically waived trial by jury. Defendant Leonard R. Montenieri was indicted by a federal grand jury in the District of Vermont on May 5, 1986 for violation of 18 U.S.C. App. II §§ 1202(a)(1). The statute reads, in pertinent part:

(a) Any person who—

(1) has been convicted by a court of the United States or of a state or any political subdivision thereof of a felony ... and who ... possesses ... in commerce or affecting commerce ... any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

The indictment charged Montenieri, having been convicted by a court of the United States of a felony, with possessing on or about June 1, 1984, "in commerce or affecting commerce a firearm, to wit: a Mossberg, .12 gauge shotgun, serial number H802716."

## FINDINGS OF FACT

Upon consideration of the evidence, exhibits, and stipulations of the parties, the Court makes the following findings of fact.

The defendant was convicted of a felony, to wit, violation of Title 18, U.S.C.App. § 1202(a)—two counts, on April 22, 1982 in the United States District Court for the District of Connecticut.

In June 1984, Alan Hornkohl owned, with his brother Edward H. Hornkohl, a salt-box chalet-type house which was constructed during 1982–83 on Oak Hill Road, Wardsboro, Vermont. In late May 1984, defendant spoke with Alan Hornkohl in person at a bar in New Britain, Connecticut. At that time Alan Hornkohl gave defendant permission to use the Wardsboro house for the weekend of June 1, 1984. Alan Hornkohl also gave defendant the key to the house. Defendant was alone at the time of this meeting and told Hornkohl that he was going to use the house alone. Defendant's friend Robin Salovitz, with whom he was living in May and June of 1984, also testified that defendant intended to go to the Wardsboro house alone.

Approximately two or three months prior to June 1, 1984, Alan Hornkohl had visited the Wardsboro house and left two .22 caliber rifles in the closet. At that time the house was in proper condition without damage to the interior, and Alan Hornkohl had locked the home when he left. Hornkohl did not lend or rent the home to anyone in the time between his last visit and his giving of the keys to defendant. Neither Hornkohl nor any member of his family owned a shotgun similar to the .12 gauge Mossberg gun found in the house.

On June 1, 1984, Sergeant (then-corporal) Parent of the Vermont State Police responded to a complaint and went to the LeKachman residence in Wardsboro, Vermont, located approximately one quarter mile from the Hornkohl residence. Sergeant Parent arrived at the LeKachman residence in the late afternoon, at which time defendant approached the cruiser from Mr. LeKachman's porch. Defendant appeared upset, his clothes were dishevelled and wet. As Sergeant Parent talked with him, defendant calmed down. He stated that he had been shot at by the police and had an ensuing gun battle with them. He eventually escaped the Hornkohl house and ran into the woods where he was again caught, but managed to escape.

Defendant got into Sergeant Parent's cruiser and directed the officer to the Hornkohl residence. The officer turned the cruiser into the driveway, which was located in front of the house, and defendant identified his jeep which was parked in front of the house. The jeep had Connecticut motor vehicle plates attached to it. Sergeant Parent observed that the area in front of the house was muddy, and a space heater was on the front lawn. He also noted that the sliding glass doors in the front of the house were broken out. At the same time, Trooper Kipp of the Vermont State Police and Fish and Game Warden Rowell arrived on the scene.

Sergeant Parent and the defendant then entered the house together. The officer immediately searched the interior to secure the house and found no one therein. He did find two .22 caliber rifles in a closet opposite the bathroom. He also found, on the floor in the first floor hallway by the bathroom, a .12 gauge shotgun with pistol grip (government's exhibit 2). The officer placed the shotgun on the homemade picnic table in the dining-room area. He even-

tually handed all the guns out the doors to Warden Rowell, who secured them in the trunk of his car.

As the shotgun was being removed from the house, defendant asked, "What are you doing with my gun?" He was concerned about the gun and wanted to know when it would be returned to him because, he stated, the gun had been given to him by a friend, now deceased, who had been a member of the defendant's motorcycle club. While Warden Rowell was with the defendant in the living-room area and the other officers were searching the house, the defendant asked, "When is my shotgun going to be returned?"

Sergeant Parent observed that there was extensive damage to the interior of the house from guns being fired, with numerous shotgun and bullet holes in the interior and the exterior walls both in the upstairs and downstairs areas. He also observed many spent .45 caliber shells, as well as a number of .12 gauge shotgun shells, some of which were live and at least one of which was spent, scattered on the floor. The sergeant also found a .45 caliber clip and .45 caliber ammunition, but did not find any .45 caliber guns.

While the officers were securing the house, defendant calmed down and changed his wet clothes. He became upset again when the shotgun was removed. Defendant also became upset when he and Sergeant Parent were leaving the house because he could not find a sum of money which he stated was under the couch. Sergeant Parent had previously secured in the trunk of his cruiser approximately $6,000 in hundred dollar bills found in the house and so advised defendant at this time. The defendant then calmed down. Defendant and the officers arranged to have defendant's jeep taken to Wardsboro, because he did not want to leave it at the house, and defendant rode with Sergeant Parent to the state police barracks.

An officer of the Alcohol, Tobacco and Firearms Division took possession of the .12 gauge shotgun from the state police barracks, and after test-firing the gun found that the gun would fire and eject projectiles. The shotgun was also laser tested for fingerprints, with a negative result. The .12 gauge shotgun, model 500 ATP, serial number H802716, was manufactured by O.F. Mossberg in 1982 in its plant at New Haven, Connecticut.

## DISCUSSION

Based on the testimony at trial, defendant has renewed his motion to suppress defendant's statements to the police officers. The original motion was denied in our Opinion and Order filed November 12, 1986 in this case. The Court credits Sergeant Parent's testimony at trial in this regard, and accordingly the renewed motion to suppress is DENIED.

To convict Mr. Montenieri the statute requires that the government prove three essential elements. The government must prove, first, that prior to June 1, 1984, defendant had been convicted by a court of the United States or of a state or any political subdivision thereof of a felony. As stated above, defendant was convicted of a felony, two counts of the violation of 18 U.S.C. App. § 1202(a), on April 22, 1982, in the United States District Court for the District of Connecticut.

Second, the government must prove that defendant, having been convicted of such felony, thereafter knowingly possessed a firearm. A firearm is "any weapon ... which will or is designed to or may readily be converted to expel a projectile by the action of an explosive ..." 18 U.S.C. App. II § 1202(c)(3) (West 1986). ATF Agent Caiazzo testified that he had test-fired the gun and determined that it was capable of firing and ejecting projectiles.

 To prove the element of possession under the statute, the government need only prove constructive possession. *United States v. Martin*, 706 F.2d 263, 266 (8th Cir.1983). "Such possession may be joint, in that it may be shared by two or more persons." *Id.* Constructive possession of a firearm is knowledge of the existence of the weapon and the power and

intention to exercise dominion and control over it. See, e.g., *United States v. Foster*, 783 F.2d 1087, 1088 (D.C.Cir.1986); *United States v. Poore*, 594 F.2d 39, 43 (4th Cir. 1979).

■ Evidence of possession presented at trial included defendant's statements to police officers. Sergeant Parent testified that as the shotgun was being removed from the house, defendant made several statements. Defendant asked: "What are you doing with my gun?" and wanted to know when the gun would be returned to him. He stated that the gun had been given to him by a friend, since deceased, who was a member of defendant's motorcycle club. Defendant later asked, in the presence of Warden Rowell, when defendant's gun would be returned to him. While these statements tend strongly to prove possession, defendant's statements alone are insufficient to establish the element of possession. Independent evidence of the facts admitted by defendant is required. *United States v. Fasolino*, 586 F.2d 939, 941 (2d Cir.1978); *Smith v. United States*, 348 U.S. 147, 151–59, 75 S.Ct. 194, 196–200, 99 L.Ed. 192 (1954); *Opper v. United States*, 348 U.S. 84, 93, 75 S.Ct. 158, 164, 99 L.Ed. 101 (1954). As to the persuasive value of that evidence,

> the corroborative evidence does not have to prove the offense beyond a reasonable doubt, or even by a preponderance, as long as there is substantial independent evidence that the offense has been committed, and the evidence as a whole proves beyond a reasonable doubt that defendant is guilty.

*Smith v. United States*, 348 U.S. at 156, 75 S.Ct. at 199; *accord United States v. Fasolino*, 586 F.2d at 941.

Alan Hornkohl, a part owner of the Wardsboro house in June 1984, testified that shortly prior to June 1, 1984, he gave defendant a key to the house and permission to use the house for the weekend of June 1, 1984. Hornkohl had visited the house two or three months prior to that time and left two .22 caliber rifles in a closet. He stated that these were the only guns left in the house. Hornkohl testified that neither he nor any members of his family owned a shotgun similar to the .12 gauge found in the house. When Hornkohl left and locked the house, it was in proper condition with no damage to the interior. Defendant's intention, stated to Hornkohl and testified to by defendant's friend, Robin Salovitz, was to go to the Wardsboro house alone. Sergeant Parent found the .12 gauge shotgun on the floor in the first floor hallway of the house to which defendant had taken the officer. All of the damage done to the house came from inside, according to the officer's testimony. This damage included shotgun holes in the interior of the house and through the exterior walls. A number of .12 gauge shotgun shells, including at least one spent shell, were observed by Officer Parent in the house. This is substantial evidence that defendant was alone in the Wardsboro house, that he was aware that the shotgun was in the house, and that he had the power and intention to exercise dominion and control over the shotgun.

■ We find the corroborative evidence sufficient to meet the standard enunciated in *Smith v. United States*, 348 U.S. at 156, 75 S.Ct. at 199. Defendant's own statements indicating possession of the gun, coupled with the corroborative evidence just mentioned, establish the possession element of the offence beyond a reasonable doubt.

■ Finally, the government must prove that defendant's possession of the firearm was in or affecting commerce. Possession of a firearm which at any time was moved in interstate commerce is possession "in and affecting commerce." *Scarborough v. United States*, 431 U.S. 563, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977). Proof that the shotgun was manufactured outside of the State of Vermont prior to the date of its possession inside the State is sufficient to establish the interstate nexus element of the statute. *United States v. Montoya*, 676 F.2d 428, 433 (10th Cir.), *cert. denied*, 459 U.S. 856, 103 S.Ct. 124, 74 L.Ed.2d 108 (1982).

CONCLUSION

In light of the above Findings of Fact and Discussion, the Court finds Leonard R. Montenieri guilty beyond a reasonable doubt of the crime charged. Defendant's motion for judgment of acquittal is DE-NIED. Sentencing will be deferred until a presentence investigation has been conducted and a presentence report submitted by the probation department.

SO ORDERED.